IN THE SUPREME COURT OF THE STATE OF OKLAHOMA

Number 106,515

SUZANNE RUSSELL, not individually but as Guardian of Donald R. Russell, an incapacitated person

Plaintiff

Versus

CHASE INVESTMENT SERVICES CORPORATION, A Delaware corporation

Defendant

State Question Certified by the United States District Court for the Northern District of Oklahoma

The Honorable Gregory K. Frizzell, Judge

# PLAINTIFF'S ANSWER BRIEF

Lawrence A. G. Johnson #4705
6450 S. Lewis Ave., Suite 103
Bridgeport III
Tulsa, OK 74136
(918) 743-0459
FAX 744-6686
Attorney for Plaintiff



EXHIBIT D

# INDEX

## PROPOSITION I: THE CASE AT BAR IS NOT AN ISOLATED INCIDENT BUT IS ONE THAT IS DEVELOPING NATIONALLY AND CALLS FOR IMMEDIATE REMEDIATION BY THE ANSWER TO THE CERTIFIED QUESTION.

1.

Dangers illustrated by Brooke Astor case    1.

## PROPOSITION II: THIS COURT SHOULD HOLD THE APPOINTMENT OF A GENERAL GUARDIAN REVOKES A DURABLE POWER OF ATTORNEY AND AUTOMATICALLY AND *EO INSTANTE* TRANSFERS ALL OF THE ASSETS TO THE EXCLUSIVE CONTROL OF THE GUARDIANSHIP COURT. SUCH A DETERMINATION PROTECTS THOSE LEAST ABLE TO PROTECT THEMSELVES FROM UNSUPERVISED ABUSE.

5.

Statutes:

| | |
|---|---|
| 58 Okla. Stat. § 1074A (2001) | 5. |
| 58 Okla. Stat. 1075B (2001) | 5. |
| 30 Okla. Stat. § 1-119 (2001) | 6. |
| 30 Okla. Stat. § 1-123 (2001) | 6. |
| 30 Okla Stat. § 1-113(B)(2) (2001) | 6. |
| 30 Okla. Stat. §3-113(E) (2001) | 7. |

Cases:

| | |
|---|---|
| In the Matter of the Guardianship of Lee, 1999 OK CIV APP 50, 982 P.2d 539 | 10. |
| In re Guardianship of Muriel K., 251 Wis.2d 10, 640 N.W.2d 773, 787 2002) | 8. |
| Schriver v Schriver, 441 So.2d 1105, 1106 (Fla. App. 1983) | 8. |

CONCLUSION    10.

PLAINTIFF'S ANSWER BRIEF

# PROPOSITION I: THE CASE AT BAR IS NOT AN ISOLATED INCIDENT BUT IS ONE THAT IS DEVELOPING NATIONALLY AND CALLS FOR IMMEDIATE REMEDIATION BY THE ANSWER TO THE CERTIFIED QUESTION.

As we have pointed out, the Courts are recognizing the growing problem with durable powers of attorney, typifying them as an **invisible epidemic** and a **license to steal.** The case at bar is not an isolated one, and we point to another abuse *ex curia* which gained some national notoriety in New York concerning Brooke Astor which was the subject of a recent article (December 31, 2007) in "Lawyers USA" as well as one in the "New York Times":

> **Dangers illustrated by Brooke Astor case**
> By Correy E. Stephenson Staff writer
> Published: December 31, 2007
>
> As the population ages and the use of power of attorney as an estate planning tool increases, attorneys are advising caution when handing so much power to another person.
> The recent case of Brooke Astor illustrates the potential dangers of power of attorney abuse, noted trusts and estates expert Bernard A. Krooks, a founding partner of Littman Krooks in New York.
> Astor, the late New York City philanthropist and socialite, had given her son, Anthony Marshall, power of attorney over her affairs. In 2006, Marshall's son filed a lawsuit seeking a court-appointed guardian for his grandmother, alleging that his own father had abused the power of attorney for unjust enrichment.
> Specifically, he claimed that Marshall failed to provide appropriate care for Astor, allowing her to live in squalor while he sold Astor's works of art and used the profits to fund his own personal ventures.
> Jeffrey Skatoff, a partner at Clark Skatoff in Palm Beach Gardens, Fla., who specializes in estate planning, said he always cautions his clients about the dangers of giving someone power of attorney.
> "Such power can be toxic in the wrong hands, and create a lot of litigation," he warned.
> Stories like Astor's have become cautionary tales for those considering using the powerful tool, said Krooks.

1

"Years ago, the focus used to be on, 'How can I make things as easy as possible for my agent to manage my affairs if I become incapacitated?'" he explained. "Now the trend is concern and putting the proper checks and balances in place."

**A fine balance**

Creating a power of attorney document is really a fine balance, Krooks said. "You want to make sure the document works and is effective, but on the other hand, you need to protect clients against the potential for abuse." Skatoff said the single most important factor in setting up a sound power of attorney is the choice of agent.

"By far the most important thing is choosing the right person, someone who has integrity and [demonstrates] financial responsibility," he told Lawyers USA.

While most people choose a relative, Skatoff emphasized that if a client has any concerns about trustworthiness, he should put his assets into a revocable trust, naming as trustee an accountant or lawyer who is required to abide by ethical standards.

"Ideally, if a client has substantial amounts of money, a trust company is really the best option," Skatoff said.

Another possible precaution is naming multiple agents to share the power. Krooks said this decision is a balancing test for clients.

"With one agent, it is easier to transact business, as only one signature is necessary," he said. "But that may not provide the necessary checks and balances a client is looking for."

In the alternative, if a client has two agents, they may disagree about the appropriate action to take - but nothing can get done without two signatures, Skatoff noted. This makes even routine matters more time-consuming and emergency matters quite difficult.

Other possible checks on an agent's power include requiring him or her to make an annual accounting to either a lawyer or an accountant, or a third party "trust protector," Krooks suggested.

**Springing or non-springing?**

Once an agent has been chosen, the next big decision is the choice of when the document takes effect.

"Springing" powers of attorney go into effect when a client is declared incapacitated, while "non-springing" powers take effect upon signing.

While many clients may include a power of attorney document as part of their estate package and wish to wait for it to take effect, springing powers "are not all they are cracked up to be," Krooks warned.

"Third parties, such as banks, are often reluctant to honor springing powers of attorney because it can be hard to establish actual proof of incapacitation," he said.

The document itself should define what constitutes incapacitation. Typically at least one affirmation from a doctor is required, but even then, the boundaries are grey.

"What about short term memory loss?" Krooks asked. "If mom or dad forgets where the car keys are, does that mean the power of attorney kicks in?"

Skatoff suggested a third and relatively new option for clients who don't want an immediate transfer to power of attorney but are concerned about a springing document.

"Create an escrow arrangement where the attorney holds the power of attorney in escrow and only releases it upon satisfactory receipt of proof of incapacitation," he said. "That way, the power of attorney document doesn't indicate that it is effective upon disability, which is what concerns third parties."

Skatoff has been using the escrow agreement for only a few years, but says it operates as a more effective transfer of the power of attorney.

**When it goes wrong**

If an agent abuses the power of attorney, it can be difficult to take action.

"These are very complex cases to litigate, because it is typically a close, trusted family member and the elderly person is apprehensive about reporting any sort of abuse," Krooks said.

The main problem can actually be finding a plaintiff to litigate a cause of action. If an elderly person passes away and the family finds a depletion of the estate, they may have a cause of action against the person who had power of attorney. But during a person's lifetime, it is necessary for someone to step in and petition the court to name a guardian. The guardian then functions as the plaintiff in a case against the power of attorney holder.

In the Astor case, her grandson stepped forward and petitioned the court for a guardian, who was appointed and challenged Anthony Marshall's treatment of his mother. Astor died in August, but in November, criminal charges were filed against her son and a family lawyer, Francis X. Morrissey Jr. for allegedly tampering with Astor's will.

Unfortunately, while the amount of money involved in that case may be unusual, the facts are not, Krooks said.

Skatoff agreed.

He is currently litigating a case where the power of attorney holder went to the bank after the person's death and emptied out the accounts. Since powers of attorney expire upon death, the family who found that all the money was gone is now suing the agent.

Skatoff recently handled another case where the power of attorney holder changed the beneficiary designation on a series of annuities to benefit himself.

"Luckily, Florida law has statutory protections [so] that a testamentary directive cannot be created with the power of attorney unless the original document authorizing the powers 'expressly authorizes such changes,'" Skatoff said.

But Florida is in the minority of states that offer such protection, he said, so attorneys in other states need to include language right in the power of attorney document specifically prohibiting such actions.

3

> Most importantly, experts emphasized, explain everything carefully to the client. And consult a specialist if necessary.
>
> "A lawyer really needs to explain all of the options available and the magnitude of powers that you are granting someone else with this document," Krooks said. "I always make sure my clients read it through and take the time to explain what they are signing and allow them to ask any questions. I also send a letter with the executed document, further explaining all of the provisions."
>
> This kind of caution is necessary when executing a power of attorney, because "if done improperly, it can be a license to steal," Krooks said.

Attorneys in Oklahoma must be admonished by this case that their *de rigueur* practice of preparing durable powers of attorney for their clients as part and parcel of estate plans demands great care from them to explain to their aging clients the dangers to which they may be exposed by executing such powers. The prudent practice should include an exhaustive explanation of the lack of control by any entity over the attorney-in-fact compared with the absolute control, including a bond, where a guardian is the alternative. Much of this can be solved by the nomination of the attorney-in-fact to serve as guardian, which nomination the courts may or may not honor, based upon qualifications to serve. Here, we have a daughter who embezzled from her father's IRA and his bond investments held by a nationally known bank. When confronted with her acts, she took the easy way out by shooting herself.

It is not without merit that all fiduciaries, when faced with a request by an attorney in fact under a durable power of attorney, must examine the language of the power to see if the requested action is within the authority of the instrument. And, most importantly, to require some written verification from that attorney-in-fact that he has no knowledge as to an appointment of a guardian of the principal *vel non*. This is because the statutory framework of the durable power of attorney statutes would still

expose the danger of such presentation of a bare instrument to a fiduciary as "evidence" as well as the appointment of a guardian being on the same footing—as "evidence."

## PROPOSITION II: THIS COURT SHOULD HOLD THE APPOINTMENT OF A GENERAL GUARDIAN REVOKES A DURABLE POWER OF ATTORNEY AND AUTOMATICALLY AND *EO INSTANTE* TRANSFERS ALL OF THE ASSETS TO THE EXCLUSIVE CONTROL OF THE GUARDIANSHIP COURT. SUCH A DETERMINATION PROTECTS THOSE LEAST ABLE TO PROTECT THEM SELVES FROM UNSUPERVISED ABUSE.

Several Oklahoma statutes need comparison:

58 Okla. Stat. § 1074A (2001):

> A. If, following execution of a durable power of attorney, a court of the principal's domicile appoints a conservator, guardian of the estate, or other fiduciary charged with the management of all of the principal's property or all of his property except specified exclusions, the attorney-in-fact is accountable to the fiduciary as well as to the principal. **The fiduciary has the same power to revoke or amend the power of attorney that the principal would have had if he were not disabled or incapacitated.**

58 Okla. Stat. 1075B (2001):

> B. The disability or incapacity of a principal who has previously executed a written power of attorney that is not a durable power does not revoke or terminate the agency as to the attorney-in-fact or other person, who, without actual knowledge of the disability or incapacity of the principal, acts in good faith under the power. Any action so taken, unless otherwise invalid or unenforceable, binds the principal and his successors in interest.

There is no room for argument here. Where the guardian court includes all of the assets in the estate without reservation to any assets held by the Durable Power of Attorney, then said Power is rendered rather "toothless" as to any control over those assets, and where a third party has actual knowledge of the appointment of a guardian, such third party is not justified in reliance upon that Power to transfer assets. *Ergo,*

*scienter* is the key. Thus, the effect is the reason for the law regarding Durable Powers ceases, and the law ceases. *Cessante ratione legis, cessat et ipsa lex.* The problem to be solved by this case is to address the problem caused by *non scienter*.

That our Legislature intended exclusive court-control over the assets of a ward is not subject to question. For example 30 Okla. Stat. § 1-119 (2001) provides:

> A guardian has only those powers over the person or the property of the ward, or both such person and property, as ordered by the court pursuant to this title.

And 30 Okla. Stat. § 1-123 (2001):

> Letters of guardianship are **evidence of the transfer of the management or administration of all assets, or the part thereof specified in the letters, of a ward to the guardian.** An order terminating a guardianship is evidence of transfer of the management or administration of all assets subject to the guardianship from the guardian to the ward, or to successors of the ward.

The Letters of Guardianship issued to Plaintiff (Record #80, Exhibit F) is silent regarding any reservation as to property, and the Inventory is certainly inclusive of the subject IRA and the bonds.

The exclusivity of the control over the IRA and the bonds is established in 30 Okla Stat. § 1-113(B)(2) (2001):

> B. After the service of notice in a proceeding seeking the appointment of a guardian or other order, in subsequent proceedings pertaining to the guardianship of a ward and until termination of the proceeding, the court in which the petition is filed **has exclusive jurisdiction** to determine:
> 1. The need for a guardian or other order; and
> 2. How the estate of the ward shall be managed, expended, or distributed to or for the use of the ward or the dependents of the ward.

That specific orders of the guardian court are required, especially as to such a weighty matter as an IRA (where the wife is guaranteed a joint and survivor interest by

Congress) and bonds, for the invasion of said assets by a guardian is without question as provided in 30 Okla. Stat. §3-113(E) (2001):

> E. The court may, in its discretion, make such further orders as the court deems necessary for the best interest of the ward for care of the ward and maintenance or management of the ward's property, including but not limited to:
> 1. Order the guardian of the property of the ward to provide the ward from such property with specified amounts of money, monthly, or from time to time, which the ward may dispose of as the ward shall determine and for which, other than a showing of the amounts paid to the ward, the guardian will not be required to account. Such order may be modified upon application of the guardian or any interested person, and a hearing conducted thereon, with notice of the hearing on such application to be given to those persons entitled to notice pursuant to paragraphs 1, 2, 3 and 7 of subsection A of Section 3-110 of this title and shall be given as provided in Section 3-110 of this title;

Of course, Chase, upon being presented with "evidence" of the existence of the appointment of guardians over their client's assets, is charged with knowledge of these statutes, and Chase's reliance upon the Durable Power of Attorney for invasion of the IRA and the bonds by the Power is totally unjustified and is irreconcilable with the schemata of guardianship.

What makes the facts of this case so crucial is the fact that even after complaints by Plaintiff to Chase about their reliance on the durable power of attorney, Plaintiff obtained an order from the guardianship court allowing her to expend moneys that were left to pay for her husband's nursing home expenses, Chase refused to honor that request, prompting a citation for contempt. (Record, 82, page 2, ¶4 of Plaintiff's Reply Brief):

> After the suicide of Kennemer, Plaintiff got a court order allowing the payment of her husband's first monies for nursing home expenses out of the remaining IRA account. When she presented the order to Chase, Naifeh told her the order was not enough, and he would not accept it. (Russell Deposition p.78-79)

7

Just what is a Durable Power of Attorney? Under common law, where a simple Power is executed, the event of incompetency revokes that Power. See <u>Schriver v Schriver</u>, 441 So.2d 1105, 1106 (Fla. App. 1983):

> In 1974 the legislature created a new power of attorney called a durable family power of attorney which was a means by which the family members could help a potentially disabled or incompetent person in handling that person's legal, business and property affairs.[FN1] This law has the beneficial effect of avoiding the time, expense and embarrassment involved in having to establish guardianships for incompetent persons.
> The essential difference this statute creates between the usual general power of attorney and a durable family power of attorney is that the latter allows the continued authority to act during a period of incapacity or incompetency, except as the statute otherwise provides. See § 709.08(2), Fla.Stat. (1981).
> And at 1107:
> The holder of a durable family power of attorney is appointed by the donor of the power, and essentially performs the same functions as would a court appointed guardian. While not a "guardian" in the legal sense, the attorney in fact has fiduciary duties similar in nature.

Searching other jurisdictions relative to just what happens to a durable power of attorney after appointment of a guardian only brings up another case where the dissent is instructive at <u>In re Guardianship of Muriel K.</u>, 251 Wis.2d 10, 640 N.W.2d 773, 787 2002) where the impact of our Section 1074 is discussed. The majority opinion held the pre-existing durable power of attorney created the attorney-in-fact a person aggrieved by a decision to appoint a guardian with standing to appeal; however, the dissent held:

> ¶ 67 Similarly, the Uniform Durable Power of Attorney Act, Wis. Stat. § 243.07 ("the Act"), provides that a durable power of attorney agent is accountable to any court-appointed fiduciary, such as a guardian, and that the fiduciary may revoke the power of attorney on behalf of the principal:
> (3) RELATION OF AGENT TO COURT-APPOINTED FIDUCIARY. (a) If, following execution of a durable power of attorney, a court of the principal's domicile appoints a conservator, guardian of the estate, or other fiduciary charged with the management of all *41 of the principal's property or all of his or her property except specified exclusions, *the agent is accountable to the fiduciary as well as to the principal. Unless the court finds that the durable power of attorney should remain in effect, the fiduciary has the same power to revoke or amend the power of attorney*

8

*that the principal would have had if the principal were not disabled or incapacitated.*
Wis. Stat. § 243.07(3)(emphasis added).

¶ 68 To avoid a conflict between an agent and a court-appointed guardian, the Act allows a principal to nominate a guardian in a durable power of attorney, and requires the appointment of the nominated guardian, with limited exceptions:

A principal may nominate, by a durable power of attorney, the conservator, guardian of his or her estate, or guardian of his or her person for consideration by the court if protective proceedings for the principal's person or estate are **787 thereafter commenced. *The court shall make its appointment in accordance with the principal's most recent nomination in a durable power of attorney except for good cause or disqualification.*
Wis. Stat. § 243.07(3)(b)(emphasis added).

¶ 69 The statutory scheme is therefore very clear: individuals may nominate agents to act on their behalf in the event they are disabled or incapacitated. Those agents are empowered to act for the principal pursuant to the advance directive if disability or incapacity occurs, in the absence of and without having to initiate formal guardianship proceedings. **But if a formal guardianship proceeding is commenced and a guardian appointed, any agency established by an advance directive is automatically revoked or revocable by the guardian, unless the court orders otherwise.** The court-appointed guardian thereafter speaks and acts for *42 the principal, *not* the former health care or durable power of attorney agent. If the durable power of attorney nominates a guardian in addition to an agent (and this may be the same person), the court must appoint the nominated guardian unless there is good cause not to, or the nominated guardian is disqualified.

¶ 70 The majority opinion upsets this statutory hierarchy, and confers standing to appeal on agents whose power to act for the principal has been nullified. There is no authority for this conclusion, and the majority essentially admits as much, relying instead on the notion that the legislature must have *assumed* that agents would have the authority to appeal because the Act allows delegation of the power to litigate. Majority op. at ¶ 33. But the power to litigate, if indeed conferred by a durable power of attorney, is only good as long as the document remains in effect. The majority does not explain how it independently survives the revocation of the power of attorney.

In the majority opinion in that case the following observation was included:

¶ 48 Recently, this court underscored the importance of judicial review of proceedings affecting incapacitated individuals in *County of Dunn v. Goldie H.*, 2001 WI 102, 245 Wis.2d 538, 629 N.W.2d 189. In *Goldie H.,* the court determined that the periodic judicial review required under *Watts* must include a hearing and fact findings demonstrating the need for

9

continued placement. *Goldie H.*, 2001 WI 102, ¶ 6, 245 Wis.2d 538, 629 N.W.2d 189. Acknowledging that the safeguards provided by judicial review require substantial resources, the court reasoned as follows:

> *34 **Taking a few moments to protect the rights of our most vulnerable citizens is not an unacceptable cost to society. It is an expression of our humanity. It is a commitment that no person will be warehoused and forgotten by the legal system.**
> *Id.* at ¶ 35. Thus, judicial review of guardianship and protective placement proceedings is a carefully guarded protection despite the undeniable burden on court resources.

640 N.W.2d at 783.

The Defendant cites <u>In the Matter of the Guardianship of Lee</u>, 1999 OK CIV APP 50, 982 P.2d 539 in support of its position; however, that case only addressed the powers designated to the attorney, excluding a power to revoke a trust, which power had been reserved to the Settlor. Here, however, the durable power granted to the daughter was extensive and unlimited. What is pertinent is the following language at 1999 OK CIV APP 50, ¶6:

> ¶6 Upon Appellee's appointment as Settlor's guardian, Oklahoma statute granted Appellee, as guardian, both the authority and duty to retrieve assets from the Trust for Settlor's benefit and to the extent necessary to provide for Settlor's needs. <u>30 O.S. 1991 §§3-118, 3-121</u>.

## CONCLUSION

This case is without precedent in Oklahoma, and not only will an answer be dispositive of the issues pending in the federal court, but it will fill an enormous hole by reason of the *sui generis* questions in all other jurisdictions in America. Even such an hoary institution as Chase seems to place supreme reliance upon a durable power of attorney over that of a guardianship, and the answer to the question before the court (or one to be fashioned by the court) would have resounding effect upon national banking institutions as well.

Perhaps this Court may expand the certified question, not only for the benefit of the federal court and the parties before it, but as a measure of guidance to the growing population of aged persons and the attorneys who attempt to serve them in fashioning estate plans. On the face of it, the use of a durable power of attorney may appear to be a money-saving device to provide for an incapacitated person *in lieu* of the direct court-supervision of the care of such a person, but the fact remains that such an alternative presents two dangers: i.e., one of a clear procedure for determining when one is incapacitated, and two being the total lack of any supervision of the attorney-in-fact holding such a powerful instrument in his hands. Do not our aged citizens deserve better?

This case will have national repercussions, but such is necessary, and Oklahoma has always presented the nation with judicial leadership in this regard.

We pray the Court to answer the question before it, or one fashioned to the broader implications involved, by ruling the appointment of a guardian revokes the authority of a durable power of attorney and *eo instante* transfers all of the assets from that Power to the exclusive control of the guardianship court.

This Court should also set guidelines for fiduciaries when faced with presentment of a durable power to inquire not only as to the scope of the power, but to demand an inquiry as to the existence of a concomitant guardianship.

Lawrence A. G. Johnson #4705
6450 S. Lewis Ave., Suite 103
Bridgeport III
Tulsa, OK 74136
(918) 743-0459
FAX 744-6686
Attorney for Plaintiff

**CERTIFICATE OF MAILING**

Lawrence A. G. Johnson certifies he mailed a true and correct copy of the foregoing instrument to Tadd Bogan, 15 East 5th Street, suite 3800, Tulsa, OK 74103 by first class mail, postage prepaid on January 3, 2009.

*[signature]*

Lawrence A. G. Johnson